IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 04-cv-02260-WDM-PAC

PAUL BLANGSTEAD,

    Plaintiff,

v.

SNOWMASS-WILDCAT FIRE PROTECTION DISTRICT, et al.,

    Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Miller, J.

This matter is before me on the motion for summary judgment filed by the defendants on October 18, 2005. I have reviewed the parties' written arguments and their summary judgment evidence and find that oral argument is not required. For the reasons that follow, the motion will be denied.

### Background

Unless otherwise indicated, the following facts are undisputed.

From approximately June 1, 1995 through April 20, 2004, plaintiff Paul Blangstead (Blangstead) was a firefighter employed by defendant Snowmass-Wildcat Fire Protection District (the District). In late 2003, he led an effort to form a local union for the firefighters in the District and was elected president of the union. According to Blangstead, the District's Fire Chief William Cowan (Chief Cowan) was very upset about the new union and the negative press he received relating to its formation.

On about April 9, 2004, Blangstead was at the Snowmass Club for a union

meeting. The Snowmass Club is an exclusive, private country club that allowed the District's firefighters complimentary use of their facilities. As Blangstead was leaving the club, he saw a notice[1] tacked to an easel announcing that the racquetball courts would soon be closed. Taking a pen from a nearby desk, Blangstead wrote "this sucks don't do it" on the notice.

The Snowmass Club management was very upset by this behavior, and suspended the memberships of all District employees. About a week after the incident, Assistant Chief John Mele (Mele) questioned Blangstead about his involvement. However, perhaps because Mele only asked whether Blangstead knew about a recent "vandalism" at the club, and never mentioned a piece of paper or a racquetball notice, Blangstead did not remember writing on the notice. Even after Mele showed Blangstead a video from the night in question, which, because of poor quality, merely showed a few seconds of Blangstead standing in front of the sign, Blangstead did not remember writing on the sign and continued to deny involvement in any "vandalism." Mele suspended Blangstead immediately following this discussion, and four days later, Blangstead was fired by Chief Cowan. This decision was later affirmed by the District's Board of Directors.

Based on these facts, Blangstead brought this lawsuit against the District, Chief Cowan, and the District's Board of Directors pursuant to 42 U.S.C. § 1983 alleging a violation of his First Amendment right to freedom of association. According to Blangstead, the "vandalism" incident is mere pretext for the real reason he was fired — because of his status as union president and Chief Cowan's anti-union animus. In

---

[1] This notice was printed on common piece of paper.

response, the defendants claim that Blangstead was fired because he vandalized the club's sign and then lied about it to his superiors.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id*.

## Discussion

It has become "axiomatic that a governmental entity cannot condition employment 'on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Schalk v. Gallemore*, 906 F.3d 491, 494 (10th Cir. 1990) (quoting *Connick*, 461 U.S. at 142). And, when a public employee claims that her termination violates her right to freedom of speech, it is well-settled that the familiar four-part test from *Pickering v. Bd. of Educ.* applies. 391 U.S. 563 (1968); *see Connick*, 461 U.S. at 142. The Tenth Circuit has summarized the *Pickering* test as follows:

> First, the court must determine whether the employee's speech can be fairly characterized as constituting speech on a matter of public concern. If so, the court must then proceed to the second step and balance the employee's interest, as a citizen, in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees. Assuming that the Pickering balancing test tips in favor of the employee, the employee, under the third step, must prove that the protected speech was a substantial factor or a motivating factor in the detrimental employment decision. Finally, if the employee makes this showing, the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision . . . even in the absence of the protected conduct.

*Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996) (internal citations and quotation marks omitted).

Although this is not a freedom of speech case, but rather one of freedom of association, the claims are sufficiently similar that the *Pickering* test generally applies. *See e.g.*, *Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2004) (applying all *Pickering* elements); *Boddie v. City of Columbus*, 989 F.2d 745 (5th Cir. 1993) (applying only the last three *Pickering* elements). It not clear, however, whether the first element (matter of public concern) applies to a freedom of association claim like Blangstead's. *See Shrum v. City of Cowetta*, 449 F.3d 1132, 1138-39 (10th Cir. 2006) (noting circuit split and the Tenth Circuit's avoidance of the issue). Nevertheless, since I conclude that Blangstead would satisfy the first element, this issue is immaterial to this motion.

1.   <u>Matter of Public Concern</u>

If the first element is required in this case, then Blangstead must show that the purposes of the union include matters of public concern. In their motion, defendants argue that Blangstead has made inconsistent statements regarding the union's purposes, and that his later claims should be disregarded as an attempt to create a

sham issue of fact.  *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.").  Specifically, defendants contrast Beardsley's April 20, 2005 deposition with his September 28, 2005 declaration.  In the earlier deposition, Blangstead testified that there were two original reasons for forming the union: (1) to enable the firefighters to be active in the community, and (2) to take advantage of benefits the union could provide its members.  (Blangstead Dep., Ex. A-2 to Defs.' Motion, at 33-37.)  Later, in the declaration, Blangstead indicated that the union was formed for several reasons, including furthering the training of the firefighters and providing public education.  (Blangstead Decl., Ex. 1 to Pl.'s Resp., at ¶ 6.)

However, even if the statements in the declaration are disregarded, I still conclude that Blangstead's remaining evidence is sufficient to survive summary judgment on this element.  In his deposition, Blangstead explained that, although future community activities would be up to the members, some ideas that were specifically discussed at the time of formation included having a smoke detector battery drive and giving away smoke detectors.  (Blangstead Dep., Ex. A-2 to Defs.' Motion, at 33-37.)  Moreover, Blangstead's evidence also indicates that in January 2004, he spoke with Chief Cowan and informed him that the union could provide the firefighters with hazardous materials training.  Therefore, I conclude that a reasonable factfinder could find that the purposes of the union included matters of public concern.

2.      <u>Balancing of Interests</u>

The District does not contend that the balancing of interests under the second *Pickering* element tips in their favor.  Therefore, I will not address this factor.

3.   Motivation Behind Adverse Action

To survive summary judgment on this element, Blangstead must produce enough evidence that a reasonable factfinder could find that he was fired because of his union affiliation.  In response to this burden, Blangstead has produced evidence of several events that he claims demonstrate Chief Cowan's anti-union animus.  For example:

a.   Chief Cowan's Interrogation of Ken Schaer

In January 2004, Chief Cowan called firefighter Ken Schaer (Schaer) to his office.  (Schaer Decl., Ex. 12 to Pl.'s Resp., at ¶ 3)  When Schaer arrived, Chief Cowan was visibly angry as he asked Schaer why he had joined the union, characterizing this as "choosing sides."  *Id.* at ¶ 5.  Schaer was shocked by the confrontation, and worried about retaliation.  *Id.* at ¶¶ 6, 8.

b.   Unfavorable Newspaper Coverage

Between December 31, 2003, and January 7, 2004, the Snowmass Sun printed two newspaper articles relating to the union's formation.  These articles did not paint Chief Cowan in a very positive light.  The first article generally reported the union's formation and included a quote from Chief Cowan saying "I'm surprised and caught off guard (by this action)."  (Newspaper Article, Ex. 12 to Pl.'s Resp.) (alteration in original) In the second article, an opinion piece, the author gave Chief Cowan a "thumbs down" for having "no clue about the concerns of his personnel, suggested that the union was

formed due to mismanagement, and predicted that there would likely be changes coming to the firehouse. (Newspaper Article, Ex. 11 to Pl.'s Resp.)

      c.      <u>Chief Cowan's Threats to Captain Beardsley</u>

Around the end of 2003, the firefighters held an organizational meeting regarding the formation of a union. (Beardsley Dep., Ex. 8 to Pl.'s Resp., at 19.) This meeting was held at a local pizza place around lunchtime on a workday when Captain David Beardsley was in charge at the firehouse.[2] *Id.* at 19-21. About two weeks later, Chief Cowan called Captain Beardsley to his office to question him about the meeting. *Id.* at 22. Chief Cowan was extremely upset and asked Captain Beardsley "why, knowing his beliefs on the union," he would let the meeting happen.[3] *Id.* Chief Cowan then told Captain Beardsley that he was facing disciplinary action in the form of suspension or worse. *Id.* at 22-23. However, within an hour after this meeting, Captain Beardsley met with Chief Cowan again, this time with Assistant Chief Mele present. *Id.* at 24-25. By this time Chief Cowan was very apologetic, and indicated that Captain Beardsley "still should have known better," but that there would be no disciplinary action. *Id.*

These events, together with other evidence, are sufficient to allow a reasonable factfinder to conclude that Chief Cowan was extremely angry and possibly embarrassed about the union's formation. Add to this the relatively short amount of

---

[2] Captain Beardsley's deposition indicates that District regulations permit the firefighters to leave the station for a one-hour lunch break so long as they all leave in a group as they did here. (Beardsley Dep., Ex. 8 to Pl.'s Resp., at 20-21.)

[3] Captain Beardsley also testified in his deposition that during his initial employment interview, Chief Cowan made it clear that "we [are] not a union department . . . and [was] not going to be a union department." (Beardsley Dep., Ex. 8 to Pl.'s Resp., at 25.)

7

time between these events and Blangstead's firing, and there arises a permissible inference that Blangstead was fired because of his union affiliation.[4] Accordingly, summary judgment is not appropriate on this issue.

4.  The District's Affirmative Defense

Having concluded that Blangstead has produced sufficient evidence to survive summary judgment on the first three *Pickering* elements, the burden now shifts to the defendants to show that Blangstead would have been fired even in the absence of his union affiliations. As movants who bear the burden of persuasion on this element at trial, the defendants must produce evidence that is so powerful that no reasonable factfinder could disbelieve it. *Herndon v. Mass. General Life Ins.*, 28 F. Supp. 2d 379, 382 (W.D. Va. 1998); 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.13[1] (3d ed. 2004). Given my conclusions from above, defendants have not met this onerous standard at this stage of the case.

Accordingly, it is ordered that Defendants motion for summary judgment, filed August 30, 2005(Docket No. 27), is denied.

DATED at Denver, Colorado, on August 14, 2006.

BY THE COURT:

s/ Walker D. Miller
United States District Judge

---

[4] Moreover, Chief Cowan's version of his meeting with Captain Beardsley is vastly different from Captain Beardsley's version. (*See* Cowan Dep., Ex. A-6 to Defs.' Motion, at 48-49.) A factfinder who credited Captain Beardsly's version over Chief Cowan's could reasonably infer that, just as he was deceptive about this meeting, he might be hiding his true motivations for firing Blangstead.